**In re Anonymous No. 30 D.B. 76**

Disciplinary Board Docket no. 30 D.B. 76.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania

ANDERSON, *Board Member*, February 13, 1980 —Pursuant to Pa.R.D.E. 208(d), the Disciplinary Board of the Supreme Court of Pennsylvania (board), herewith submits its findings and recommendations to your honorable court with respect to the above proceeding.

## I. HISTORY OF PROCEEDINGS

On October 26, 1976, pursuant to an order signed by Chief Justice Benjamin R. Jones of the Supreme Court of Pennsylvania, [Respondent] was ordered "suspended forthwith" from the practice of law pursuant to Supreme Court Rule 17-14(A) [see now, Pa.R.D.E. 214]. Additionally, the court referred the matter to the Disciplinary Board of the Supreme Court of Pennsylvania for the institution of formal proceedings to determine the extent of discipline to be imposed. On October 17, 1977, a petition for discipline was filed by the chief disciplinary counsel (hereinafter referred to as petitioner) and no answer was filed by respondent within the prescribed time. On November 9, 1977, the matter was referred to hearing committee [ ]. Respondent was notified on January 24, 1978, of a hearing scheduled for March 27 through 31, 1978. A request for continuance from respondent was received on January 31, 1978, and said request was

denied by the chairman of the Disciplinary Board. On October 18, 1978, the hearing committee report and recommendation of disbarment was filed. On November 3, 1978, a letter was received from respondent requesting that counsel be appointed to represent him in filing his brief on exceptions and oral argument. This request was denied on November 7, 1978, by a letter from the secretary of the board advising him again that the board had no authority to appoint counsel. Respondent requested an extension of time in which to file briefs on exceptions on November 13, 1978, which request was granted. A second request for an extension of time in which to file a brief on exceptions was granted on November 21, 1978. Respondent, on December 1, 1978, petitioned the Supreme Court for appointment of counsel. This request was denied by the Supreme Court on December 29, 1978. On December 6, 1978, respondent's brief on exceptions was filed to which petitioner filed a brief opposing exceptions on January 8, 1979.

A panel was designated by the Chairman to hear oral argument on January 24, 1979. This panel consisted of John C. Anderson, Chairman, Henry T. Reath and Frank J. McDonnell. This oral argument was held on March 9, 1979, where respondent represented himself. After he preserved his right to appeal on his request for the appointment of counsel, the oral argument proceeded.

The majority of the oral argument panel concurred with the recommendation of the hearing committee that respondent be disbarred.

## II. HISTORY OF THE CASE

Respondent, [    ], was admitted to the practice of law in 1959 by the Supreme Court of Pennsylvania.

He was associated with the firm of [ ] until 1972, when he became a sole practitioner representing clients in the field of mutual funds and the "blue sky laws." He is a resident of [ ], Pa., married and the father of eight children.

In 1971, respondent became involved in a tract of land located in [ ], which was previously owned by [A] and subsequently by [ ]. In response to threats of development of the land in 1970, he organized a committee of neighbors to prevent the proposed development. Eventually, a committee was formed called the [A] Tract Committee. This committee was a non-profit corporation whose objective was to stop the development and also to provide a tax shelter for those citizens who participated by making contributions to the non-profit corporation. The group was to purchase the tract of land. In March of 1972, the committee purchased the tract of land for $4,500,000. Respondent was elected president and treasurer of the committee and served in those capacities until the corporation dissolved. The tract of land included approximately 250 acres, of which 140 acres were to be acquired by Montgomery County for use as a park. Said acquisition was to be accomplished by condemnation by the County Commissioners with a sum of $7,000 as just and fair compensation. Additionally, moneys were borrowed from the First Pennsylvania Bank and Trust Company, which took back a mortgage of $3,000,295, and [ ] in the amount of $225,000. It was further agreed by the members of the committee that the remaining portion of the tract would be sold to residents of [ ] who were people they believed to be in the same social class as themselves.

In April of 1972, the board of directors of the committee authorized respondent to borrow money

to fund the interim indebtedness of the committee. The board of directors and the committee informally delegated the complete responsibility of effecting the conveyances of various lots of the [A] Tract to respondent.

Respondent, in furtherance of his duties of conveying portions of the tract to prospective buyers, encountered his first difficulties. Respondent would variously accept moneys from prospective buyers and in fact schedule dates for settlement. After getting the initial down payment, no settlement would ever be held and he would continue to delay said settlements. Eventually, he would state there were various legal problems that were holding up the settlement dates and failed to convey the tracts of land to the prospective buyers. There was never any explanation as to the whereabouts of the money given by the prospective buyers and this failure to do so led to his arrest. Respondent also forged legal documents and misappropriated funds, as will be shown in the findings of facts.

## FINDINGS OF FACTS

### Charge I

On February 25, 1976, an information was filed with the Clerk of Courts, County of [ ], charging that respondent "on or about January 24, 1975, in said county, unlawfully and feloniously with intent to defraud did alter or utter as so altered with knowledge of the forgery, the writing of a certain promissory note in the amount of $45,000; (2) that he unlawfully and feloniously with intent to defraud or injure a person and with knowledge that he was facilitating a fraud, did make, complete, execute, authenticate, issue, transfer or utter . . . a

writing, to wit, a certain promissory note." On or about October 12, 1976, respondent pled guilty to the charges contained in said information and in lieu of sentence, respondent was released on probation for a period of 24 months and required to pay $5,000 for the cost of prosecution and $5,000 for the use of the county, and to make restitution in a sum to be determined. Respondent pled guilty only to the above charge.

## Charge II

Respondent negotiated on June 8, 1973, with [Mr. and Mrs. B.] for the purchase of Lot No. 37 for $41,900. (Upon signing the agreement, the [Bs] gave $2,095 within 15 days. They were to pay $37,710 at settlement. Said settlement was to occur within 90 days of the date therefrom or to be mutually agreed by the parties. If the seller could not give good and marketable title, the seller was to return the money received from the buyers as a deposit.) The agreement was executed on June 11, 1973, and the required down payment of $2,095 was made. Additionally, the [Bs] provided respondent with $2,095 on June 22, 1973, $1,710 on August 9, 1973, and $5,000 on August 9, 1973, pursuant to respondent's request that additional down payment moneys would be needed to assure the purchase. Another $2,000 was paid on December 28, 1973, as was $2,000 paid on December 31, 1973. Respondent scheduled and postponed the settlement on numerous occasions. The settlement never occurred because respondent failed to arrange the release of liens of the mortgages upon Lot 27 of the [A] Tract. By July 17, 1974, respondent had not held the settlement and agreed at that time to give the [Bs] his own check for $18,700, with full knowledge

that his checking account contained insufficient funds to cover the check. A second attempt to retrieve the money was made on September 16, 1974, whereupon respondent returned $5,000 to the [Bs]. He also tendered another check on his account in the amount of $10,200 on October 24, 1974. Again, respondent did not have sufficient funds to cover this transaction. Respondent never deposited any of the funds received from the [Bs] in an identifiable bank account in either the name of the committee or the [Bs], and converted said funds to his own use in the amount of $13,700.

## Charge IV

Respondent on February 9, 1973, agreed to sell a parcel of the [A] Tract to Mr. and Mrs. [C] for $22,000. The [Cs] provided respondent with a $2,200 deposit. He did not place said moneys in an identifiable account maintained for the committee or for the [Cs]. On February 20, 1973, Mr. [C] by letter advised respondent that he was interested in acquiring 20 additional lots for the price of $400,000. On April 9, 1973, respondent accepted [Mr. C's] offer and pursuant thereto, [Mr. C] provided respondent with a $40,000 deposit. These ' funds were not placed in any known account. In relation to the second transaction, another check was given on the second transaction to respondent on August 18, 1973, in the amount of $25,000, to which said money was again not deposited in a proper account. The original agreement of sale for the second purchase of property was replaced with a new agreement of sale executed on February 4, 1974, in which respondent acknowledged that the committee had received the $65,000 towards the purchase price. Respondent made this allegation

knowing full well that said acknowledgment was false. Additionally, the property that was subject to these agreements was already part of a parcel committed to [ ] County and set for condemnation. Respondent was fully aware these activities had occurred and did not advise [Mr. C] of this. Respondent later sold the same parcel of land to [D] and [E] and never advised them of his prior agreement with [Mr. C]. The $65,000 has never been returned to [Mr. C], although he has demanded same.

## Charge V

On or about May of 1973, [F] entered into an agreement of sale with respondent for a portion of the [A] Tract and tendered a down payment of $40,000 on May 17, 1973. Respondent did not place this money in an identifiable bank account or an account maintained for the funds of the committee or [Mr. F] and converted the funds to his own use. [Mr. F] subsequently discovered that a prior agreement of sale had been executed between respondent and [G] for the same land and respondent acknowledged same by letter dated November 29, 1973, but stated the agreement with [G] could be voided. He further indicated to [Mr. F] that pursuant to the voiding of the agreement, he should be provided with an additional $70,000 for the purchase of the land. [Mr. F] acceded to this request and provided the additional $70,000, which was not deposited in an account either for the committee or for [Mr. F]. Said funds were also converted to the use of respondent. On February 1, 1974, respondent requested an additional $21,000 and stated he would convey this property free and clear of all liens upon its payment. [Mr. F] paid the $21,000 which

was not placed in an identifiable bank account. Respondent advised [Mr. F] the land had been conveyed to [G] and although they were presently holding title, they would be agreeable to reconveying the property to the [A] Tract. On April 25, 1974, [Mr. F] provided respondent with an additional down payment of $15,000 and an agreement of sale was executed. On May 24, 1974, a second agreement of sale was executed between respondent and [Mr. F], whereby a second parcel of land would be conveyed to [Mr. F] in the event the first parcel could not be conveyed. A demand was made on respondent to deliver title to the property to the second parcel of property. On June 28, 1974, when neither tract of land was conveyed, it was agreed between respondent and [Mr. F] that $146,000 which had already been paid to respondent would be placed in an escrow account in the name of [Mr. F's] corporation. In response to this, respondent prepared and delivered to [Mr. F] three checks totalling $146,000, with full knowledge that the bank account did not contain sufficient funds to cover the checks. [Mr. F], upon depositing the checks, was informed of the insufficiency of funds and has made numerous demands on respondent to return the $146,000, all of which has been for naught.

Subsequently, respondent attempted to convey the property already under agreement to [Mr. F] to a new purchaser named [H], a real estate broker. This transaction was complicated by the fact that [Mr. F] had recorded his agreement of sale and had already filed an action against the committee for specific performance and/or damages. [Mr. F] obtained a default judgment but did not move for assessment of damages. Respondent, in spite of this action and with full knowledge thereof, showed

a letter to [H] purporting to show that [Mr. F] was not reserving his right to claim specific performance of the contract, but that he was going to reserve his right to compel the [A] Corporation to convey to him another portion of the [A] Tract. This letter was purportedly signed by [Mr. F's] attorney, but was actually prepared by respondent, without the knowledge, authorization or consent of [Mr. F's] attorney and purely for the purpose of defrauding [H].

## Charge VI

On or about May 2, 1972, [Mr. I] provided respondent with $1,000, representing his down payment for the purchase of Lot No. 30. [Mr. I] provided respondent with a total of $2,024, which was not placed in an identifiable bank account maintained for the committee for [Mr. I]. On June 7, 1972, respondent and [Mr. I] executed the agreement of sale for Lot No. 30 for the purchase price of $20,240.

On or about October 2, 1972, respondent entered into a second agreement of sale for Lot No. 30 to [Ms. J] and although said lot was conveyed to [Ms. J], on June 25, 1973, respondent executed an extension agreement with [Mr. I] with regard to the same lot. Respondent arranged and postponed numerous settlements of this property and [Mr. I], in April of 1974, learned that Lot No. 30 had already been conveyed to [Ms. J]. [Mr. I] made numerous demands for the return of his $2,024, but said demands have gone unanswered.

## Charge IX

On November 30, 1973, respondent obtained on his or the committee's behalf, $25,000 from [K], whereupon he forwarded said funds to the [ ], in

conjunction with a personal real estate transaction. In an effort to repay this loan, respondent on February 22, 1974, presented a check to [K], in the amount of $25,000, having full knowledge that he had insufficient funds in the checking account. He later gave [K] a check in the amount of $250. The bank account still contained insufficient funds to cover said check. On April 10, 1974, respondent presented [K] with a check for the amount of $1,500, but immediately thereafter stopped payment of this check.

Respondent later repaid [K] its $25,000 by the use of checks given to the [A] Tract Committee for the purchase of lots.

### Charge X

On February 2, 1974, respondent sent a check to [K] in the amount of $25,000 with knowledge that he had insufficient funds in his checking account to cover the check. On March 6, 1974, respondent entered into an agreement of sale in the name of the committee with [L], Esq. [   ] for the purchase of Lot 26-B for $30,775, and a down payment check of $6,155 for the purchase of said property was given to respondent. Respondent did not deposit said check, but endorsed and sent it to [K] in partial payment of the loan he had obtained. An agreement of sale between [L] and respondent was executed on March 6, 1974, even though respondent knew that the property was condemned by [   ] County and was to be conveyed to it for the purpose of the park; and secondly, the property was the subject of an agreement of sale between the committee and [Mr. C] as of April of 1973. Respondent was well aware he could not convey title to [L] because of these problems. [L] became aware of this and demanded his down payment, to which respondent gave a

check in the amount of $6,334.78, with full knowledge that he did not have sufficient funds to cover this check in any account. [L's] down payment has never been returned to him.

## Charges XI and XII

These charges refer to the allegations contained in Charges IX and X in regard to the $25,000 borrowed from [K] and paid by respondent to [   ] in conjunction with a personal real estate transaction. Respondent wrote a bad check to cover the loan to [K] and said check had been returned. In March of 1974, respondent approached [M] concerning a crisis which had arisen with the committee and said a loan of $10,000 was needed. [M] discussed this with one [N] and they both agreed to lend the committee $5,000 apiece. Notes were executed by respondent in the name of the committee, promising to pay each of the lenders $5,000 upon demand. Respondent received $5,000 from each party, but did not place the money into an identifiable bank account or an account maintained for the funds of the committee. He then sent the $10,000 to [K] as a partial payment of the $25,000 loan made by him for his private use. Subsequent demands by [N] and [M] have never elicited a response.

## Charge XIII

In January of 1974, [M] and [N] decided to participate in the purchase of a lot and a check for $4,000 was given to respondent for said purchase. Respondent failed to deposit and maintain the said $4,000 in any account of the committee or in the name of [N]. [N] demanded that respondent return the $4,000 to him when the transaction was not

consummated. Respondent, on May 3, 1974, provided [N] with a check for $4,000, knowing the funds did not exist. On May 10, 1974, respondent executed a second check for $4,000 and this check was written on an account which contained insufficient funds to cover said check. Numerous requests have been made to respondent for the return of said $4,000 and these requests have come to naught.

## Charge XV

Respondent had entered into negotiations for the purchase of property in [   ], through a real estate agency named [O]. He issued a check in the amount of $170,000 payable to [O], knowing full well that his account had insufficient funds to cover the check. At the issuance of this check, respondent had $57.55 in his account. On May 28, 1974, respondent went to the American Bank & Trust Co. of Pennsylvania in its [   ] office and attempted to negotiate a $170,000 loan in his capacity as an attornty for [P] and [Q]. Additionally, he negotiated a personal loan for himself in the amount of $11,500. He successfully negotiated the loan for $170,000 by bringing the personal financial statements of [P] and [Q] and by allegedly securing their signatures on a promissory note. In fact, all of the papers presented by respondent were forgeries and he was in no way empowered to make any business transactions for [P] or [Q]. The bank drew the moneys and at respondent's direction, made same payable to the order of [O]. Respondent later appeared at the real estate settlement on the land in question in Florida but was advised that an additional $200,000 was needed to close the transaction. When in fact he was not able to raise the addi-

tional money, he forfeited the $170,000 he had paid to [O].

On June 27, 1974, respondent in repaying the personal loan made from the American Bank, presented them with a check in the amount of $11,000, drawn on the committee account, with full knowledge there were insufficient funds in the account. On July 30, 1974, respondent presented to the American Bank a check drawn from the attorney escrow account in the amount of $11,599.67, with full knowledge that his escrow account did not contain sufficient funds to cover this check. On August 1, 1974, respondent sent the American Bank a check in the amount of $174,060.15, with full knowledge his account contained insufficient funds to cover the check. This check was issued to repay the loan made on behalf of [P] and [Q]. This check was returned marked insufficient funds. Respondent has failed to repay any portion of the $170,000 or the $11,500, which he obtained from the American Bank.

## Charge XVI

On February 19, 1973, [R] and respondent entered into an agreement of sale for the purchase of a parcel of land on the [A] Tract and [R] provided respondent with a down payment of $2,200 towards the total purchase price of $22,000. Respondent failed to deposit this money in any identifiable bank account maintained for the committee or for [R]. The parcel of land in question was also under an agreement of sale between the committee and [Mr. C]. The conveyance of this property was never consummated and the $2,200 was never returned. In 1973, respondent and [R] entered into a negotiation for the purchase of a second parcel of land and [R] provided respondent with approximately $65,000,

which was the full purchase price. Respondent did not place this money in an identifiable bank account maintained for the committee or for [R] but converted the funds to his own use. [R] made demands on respondent to return his down payment and purchase money and respondent returned portions of the money. He gave [R] $11,381.17, which represented the personal loan made by American Bank. He additionally gave him $30,000, which represented the down payment by [S] on property in Florida and an additional $13,500 provided him by [S] towards the purchase of property from the Estate of [ ].

## Charge XVII

Respondent in May of 1974, was legal counsel to [S]. He recommended to [S] that he purchase eight acres of real estate in the [ ], as an investment. The total investment was to be for $320,000. [S] gave $30,000 to respondent as a down payment for the purchase of said property. This $30,000 was not applied to a down payment for the property and was never placed in any account maintained for the funds of [S]. Instead, said funds were used by respondent to repay money owed to [R]. In August of 1974, respondent was provided with an additional $34,000 which was to be applied for a down payment on the property located in [ ]. These funds were not applied to the purchase of the property, nor were they placed in any identifiable account maintained for [S] by respondent, and said moneys have never been accounted for nor returned to [S].

## Charge XVIII

In April of 1974, respondent induced [S] to purchase a portion of real estate located in [ ]. [S]

delivered to respondent a down payment of $23,500 toward the total purchase price of $235,000. Respondent failed to place any of this money in an account maintained for the committee or for [S]. This money was used by respondent to repay [R]. Respondent postponed the settlement of [S]'s purchase of the real estate because either respondent did not show up or because of a technicality. The $23,500 was never paid to the executors of the proposed purchased property and they had never signed an agreement of sale. Settlement finally proceeded when respondent agreed to give [S] the sum of $23,500 from his safe deposit box after the settlement. Settlement was concluded and respondent did not purchase the property for the sum of $235,000 because the estate had never agreed to sell it at that price. [S] paid between $260,000 and $280,000, plus the agent's fee. Additionally, he borrowed $23,500 to complete the settlement. Respondent refunded approximately $18,000 of the $23,500, but [S] never received the balance of the money. [S] received the refunded money only after numerous worthless checks were issued to him by respondent.

## Charge XIX

In February of 1974, respondent, acting as counsel to [S], informed him of an offer by [T], Esq., to purchase a four-acre tract from the [A] Tract owned by [S]. [S], after negotiations by respondent, agreed to sell the tract for $160,000. Subsequently, respondent drew up an agreement of sale and inserted the purchase price of $82,500. [S] rejected the agreement, indicating he would only sell the property for $160,000. Respondent replied that the $82,500 was not the actual purchase price, since

the other $77,000 would be paid from the [A] Tract Committee because of moneys it owed [T] for services rendered by him to the committee. Additionally, [T] wanted the price to be shown as $82,500 for tax purposes. Respondent knew that [T] had only offered $82,500 and that no moneys were due for services owed by the committee to [T]. [S] signed the agreement of sale and respondent informed [S] by letter that the total purchase price would be $160,000 and that the [A] Tract Committee would pay the additional moneys. Said difference has never been paid to [S].

## Charge XX

In December of 1973, respondent told [S] that the [A] Tract Committee needed a donation of $5,000. This request was acceded to and this money was placed in a checking account in the [   ] National Bank and withdrawn by a check payable to respondent on the same day from the committee bank account. In February of 1974, respondent asked [S] to provide an additional $45,000 for approximately ten days for the use of the committee. This money was placed in the [A] Tract's bank account in the [   ] National Bank. At the time of the deposit of these funds, the checking account showed an actual overdraw of $46,010.87. [S] attempted to secure the funds after ten days and after repeated tries, on May 1, 1974, a check for $14,000 was repaid to [S], but the balance has never been repaid.

## Charge XXI

In 1974, respondent, acting as counsel for Mr. [S], contracted to purchase a plot of land in [   ], which bordered his home there. The purchase price was

$35,000 and [S] deposited $3,500 toward this transaction. [S], in order to complete the transaction, requested that the loan made by him to the [A] Tract Committee be repaid. Respondent assured [S] that he would forward the balance of $31,500 to [ ] from the committee's bank account. Respondent did forward a check; however, he knew this check was worthless and as a result, the sale was never consummated and [S] forfeited his $3,500. Through his representations by respondent, [S] has lost moneys totalling $200,000.

## CONCLUSIONS OF LAW

The board adopts the conclusions of law of the hearing committee and finds that respondent has violated the following:

1. Disciplinary Rule 1-102(A)(3): a lawyer shall not engage in illegal conduct involving moral turpitude (in 16 separate instances);

2. Disciplinary Rule 1-102(A)(4): a lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation (in 16 separate instances);

3. Disciplinary Rule 1-102(A)(6): a lawyer shall not engage in any other conduct that adversely reflects on his fitness to practice law (in 16 separate instances);

4. Disciplinary Rule 9-102(A): all funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein (in 12 separate instances);

5. Disciplinary Rule 9-102(B)(1): a lawyer shall promptly notify a client of the receipt of his funds,

securities, or other properties (in 5 separate instances);

6. Disciplinary Rule 9-102(B)(3): a lawyer shall maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them (in 10 separate instances);

7. Disciplinary Rule 9-102(B)(4): a lawyer shall promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive (in 10 separate instances);

8. Disciplinary Rule 7-101(A)(3): a lawyer shall not intentionally prejudice or damage his client during the course of the professional relationship;

9. Disciplinary Rule 7-102(A)(4): in his representation of a client, a lawyer shall not knowingly use perjured testimony or false evidence;

10. Disciplinary Rule 7-102(A)(6): in his representation of a client, a lawyer shall not participate in the creation or preservation of evidence when he knows or it is obvious that the evidence is false.

## ORAL ARGUMENT

Oral argument was requested by respondent and it was granted by order of the Disciplinary Board Chairman. Respondent was represented by himself at this hearing and after preserving his rights in requesting that counsel be appointed for him, proceeded with his argument. The argument dealt with three basic questions: (1) the denial of his right to counsel of his choice in defending this matter; (2) prosecutorial misconduct by petitioner in the person of Assistant Disciplinary Counsel; and (3) a request to reopen the matter to produce wit-

nesses and explain his side. The problems as addressed by respondent and the decisions of the board are contained in the following:

1. *Respondent's Request for the Appointment of Counsel.*

Respondent first raised the question of the appointment of counsel in a letter to Assistant Disciplinary Counsel, [U], Esq., who filed the petition for discipline. The letter contained a notation that respondent was seeking counsel to represent him in both the criminal and the disciplinary matter concerning his alleged activities with regard to the [A] Tract. His purported intention was to pay his counsel fees through funds raised from his friends and relatives. On January 16, 1976, Mr. [U] sent a reply to [Respondent] in which he denied respondent an extension of time, but made no comment about the appointment of counsel. On February 3, 1976, respondent wrote the Chairman of the Disciplinary Board apprising him of his inability to raise funds to secure the services of legal counsel and inquiring as to any procedure whereby the board could appoint counsel for him. On February 10, 1976, a letter was sent to [Respondent] from the chairman of the board stating there was no procedure by which he could appoint counsel and it would in fact be respondent's personal responsibility to obtain counsel. Respondent, on February 23, 1976, in a letter to [U], Esq., Assistant Disciplinary Counsel, stated that in spite of the views given by the then Chairman, Mr. [ ], he was making a formal request for the appointment of "competent and experienced counsel." He cited the basic Constitutional rights inherent in his right to practice his profession and since he lacked funds to engage counsel, counsel should be provided for him. On

March 10, 1976, a letter was sent to the Chairman of the Disciplinary Board by Allen Zerfoss, Chief Disciplinary Counsel, asking that the entire board formally consider respondent's request. The letter also pointed out that no charges had been filed against [Respondent], but he had been advised of certain allegations of professional misconduct. On April 5, 1976, respondent was sent a letter by the Chairman of the Disciplinary Board relating to him the board's action in denying his request for the appointment of counsel. He was advised that the board had unanimously determined that no responsibility could be assumed by the board to provide him with counsel, and his matter would proceed without further delay.

On October 17, 1977, a petition for discipline was filed against respondent. The hearing was held on March 29, 1978. Respondent absented himself from the country for business reasons and did not return until after the hearings. Numerous pieces of correspondence between respondent and Assistant Disciplinary Counsel made the date known to respondent. It is evident respondent voluntarily did not wish to avail himself of a defense in the matter. His extended absence was also a violation of his probation.

On October 19, 1978, respondent was supplied with a copy of the hearing committee's report and advised of his rights to file exceptions. A brief on exceptions was filed on November 7, 1978. Respondent reasserted his right to appointed counsel.

Respondent filed a petition for the appointment of counsel with the Supreme Court of Pennsylvania in December of 1978. This request was denied on December 22, 1978 by the court without an opinion.

The oral argument committee dismissed respondent's plea of ignorance of the refusal to appoint

counsel caused by respondent's assertion of a lack of communication. The record is replete with correspondence reiterating the board's position. At the argument, there was a question of lack of response to respondent's letter of February 6, 1978, and a reference in the letter to an unanswered communication to Chief Justice Eagen for the appointment of counsel. A reply letter written by Nan Cohen, Secretary of the Disciplinary Board dated February 16, 1978, was produced by Assistant Disciplinary Counsel. It's receipt by respondent was denied, although later investigation produced a receipt for certified mail signed by respondent's wife for the February 16, 1978 letter. Respondent's wife had been given power of attorney by respondent to receive all such communiques. The last correspondence advising respondent of the board's lack of authority to appoint counsel was in response to his request for such an appointment to aid him in filing his brief on exceptions.

The Disciplinary Board is not empowered to grant the appointment of counsel and the denial of respondent's petition by the Supreme Court affirms such action.

2. *Prosecutorial misconduct by petitioner in the person of Assistant Disciplinary Counsel.*

Respondent objected to petitioner's opening statement to the hearing committee because it mentioned certain allegations which petitioner did not prove in his case in chief. A review of this matter is necessitated by the allegation of prosecutorial misconduct. Prosecutorial misconduct has been carefully scrutinized by our Supreme Court and has led it to make such findings even in cases where the relief granted has not been specifically complained

of by the appellant. Although normally respondent would be barred from raising certain questions on appeal since they were not raised during the hearing, it is felt his arguments should be examined. It is well established in our system of jurisprudence that an opening statement has no evidentiary weight or probative value whatsoever. If anything in our courts, it is the step in trial procedure used to describe that which one intends to prove. It is the measuring rod by which the prosecutor or plaintiff's case must be measured. If the prosecutor does not meet the burden of proof then the only alternative for the hearing authority is to dismiss the charge. It is not prosecutorial misconduct to allege that certain things have happened, but because of a lack of witnesses, etc., you are unable to prove them at the time of trial. This does not raise the spectre of prosecutorial misconduct. In the instant case with the numerous matters before the hearing committee, the few charges that were unproven could not be attributed to the Assistant Disciplinary Counsel for the sake of intentionally prejudicing the hearing committee against respondent. Therefore, the board must dismiss this argument.

3. *Request to reopen the matter and to allow respondent to produce witnesses and explain his side.*

Respondent raised the argument that certain witnesses called to testify by way of deposition were not actually absent from the jurisdiction and could have been present to testify in person. This question should have been raised at the time of the hearing. Respondent in this case cannot raise these questions at oral argument and attempt to use this as a reason for reopening the case. Oral argument can-

not be used as a vehicle to present testimony which should have been presented at the hearing. It would make a pure mockery of these proceedings to allow respondent at this time to reopen this matter. Respondent knew of the proceedings but thought it was necessary for him to be in Europe. He professes to hold his right to practice his profession so deeply at this point when the harshest of penalties has been recommended for him. He had an obligation, coupled with his more than adequate notice to be present, to have either participated in a defense or have one presented for him. There were never adequate reasons given for his absence and any reason in a matter of such great importance to an individual involved in this livelihood is inadequate.

This argument is also denied.

## DISCUSSION

The board has never been presented with a case of misconduct of this magnitude in its history. Never have we seen such flagrant misconduct of the basest nature committed by an attorney. We are overwhelmed when we just attempt to calculate the total amount of money misappropriated or never accounted for.

The board in rendering its decision need go no further than to examine the felony to which respondent pled guilty. It need only find the illegal conduct involved "moral turpitude." The crime was forgery—a crime that of its very nature involves the altering of a writing of another without his authority and with the intent to defraud or injure someone; it applies to anyone who makes, completes, executes, authenticates, issues or transfers any writing so that it purports to be the act of another who did not authorize that act: Crimes

Code, 18 Pa.C.S.A. §4101. There is no question of the basic immoral tenor of this crime.

Added to this charge is the multitude of instances, 16 to be exact, where the hearing committee and the board found respondent guilty of activities involving moral turpitude. This is a unique case in which there is a great quantity of evidence against respondent. Respondent has betrayed the most basic trust of an attorney. He has shown a total disregard for: (1) his fiduciary functions; (2) the handling of client funds and funds escrowed to him; (3) protecting the rights of his personal clients; (4) the writing of checks with full knowledge that there were insufficient funds to cover them; and, (5) the bold misappropriation of funds entrusted to him, coupled with an inability to repay this incalculable sum. All of these acts affirm the hearing committee's finding of 88 separate violations. There are more than enough misdeeds to apply the harshest of penalties to this respondent. An examination of the various and numerous proven allegations and a look at his flagrant misuse of the public, his clients and his profession can do nothing but, alas, make one shudder that this person was loose in our midst and called himself an attorney.

Before the board recommends the disbarment of a person it examines the record and respondent's background for mitigating circumstances. But when you comprehend the sheer magnitude of the acts committed by respondent in his capacity as an advisor and attorney, one finds no reason for mercy. He has done too much to besmirch the character of attorneys throughout this Commonwealth. He was a person of some wealth and notoriety who because of his lofty position in the community lulled it into a false sense of security. Many knew him as a lawyer

of some repute and were very susceptible to his "pen and ink robberies." There is no clearer case of the fox being allowed in the proverbial chicken coop.

Additionally, there was a severe lack of remorse on the part of respondent as shown by his attempted explanation of the reason for his guilty plea. This explanation—family problems—in light of the enormous amount of evidence showing misconduct in not only that case, but in the other 16 charges only fuels the necessity for the harshest discipline against respondent.

The board cannot express its revulsion adequately in this matter. Although we are not directly involved in the wrongdoing of respondent, we as lawyers cannot help but feel shamed. Therefore, we rebuke this respondent in the strongest manner that we can. We are hereby recommending to the Supreme Court that respondent be disbarred.

Henry T. Reath, Esq., dissents.

Raymond Pearlstine, Esq., did not participate in the consideration or decision of this case.

## DISSENTING OPINION

REATH, *Board Member*, February 13, 1980—I am not completely satisfied that respondent had a full measure of due process and an opportunity in a case of such seriousness to effectively challenge the testimony against him or offer appropriate evidence in his defense. Accordingly, I would remand to the hearing panel with a direction that respondent be given the opportunity which he claims he was denied.

## ORDER

EAGEN, *C.J.*, And now, February 28, 1980, the report and recommendation of the Disciplinary Board of the Supreme Court of Pennsylvania dated February 13, 1980, is hereby accepted; and it is ordered, that the said [Respondent], be, and he is forthwith disbarred in accordance with Pa.R.D.E. 204(1) from the practice of law in this court and all the courts under its supervisory jurisdiction and until further order of the Supreme Court.